IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIRQ JOHNSON, | CIVIL ACTION NO.: 16-3599 |
| Plaintiff, | |
| v. | |
| NATIONAL RAILROAD PASSENGER CORPORATION ("AMTRAK") | |
| Defendant. | |

DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S ("AMTRAK") MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT CARL BERKOWITZ PURSUANT TO *DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.*

## INTRODUCTION

This cases arises from an incident at Amtrak's 30th Street Station on the night of July 3-4, 2014. Plaintiff, an intended SEPTA passenger who was visually impaired, boarded an Amtrak train at Wilmington Station. This Amtrak train, which does not have scheduled pickups at Wilmington, accepted plaintiff and other SEPTA passengers because SEPTA's service was suspended due to power outages.

Plaintiff alleges that when the train arrived at 30th Street Station, he exited and was accidentally pushed off the train platform and onto the tracks. He sustained left arm and right leg/ankle fractures as a result of the fall. Plaintiff alleges that this accident occurred because Amtrak failed to adequately assist him and provide proper crowd control on the train platform.

Amtrak submits this memorandum of law in support of its motion to preclude plaintiff from presenting testimony at trial from Carl Berkowitz, plaintiff's liability expert, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, and to Federal Rule of Evidence 702, because

Berkowitz's opinions are not based on sufficient facts or data and are not the product of reliable principles and methods.

## PROCEDURAL HISTORY

On June 30, 2016, plaintiff Kirq Johnson filed a Complaint against National Railroad Passenger Corporation ("Amtrak") and Southeastern Pennsylvania Transportation Authority ("SEPTA"). (Docket No. 1). On July 27, 2016, SEPTA filed a motion to dismiss for failure to state a claim. (Docket No. 5). On August 11, 2016, plaintiff filed a First Amended Complaint, alleging common law negligence (Counts I and II) and state-created danger (Counts III and IV) against Amtrak and SEPTA. (Docket No. 12). On August 26, 2016, Amtrak answered plaintiff's First Amended Complaint and cross-claimed against SEPTA for contractual and common law contribution and indemnification. (Docket No. 15).

On August 24, 2016, SEPTA filed a motion to dismiss the First Amended Complaint. (Docket No. 14). On October 26, 2016, the Court issued an Order and Opinion granting SEPTA's motion and dismissed Counts I and III of the Complaint. (Docket Nos. 27-28). On November 21, 2016, a stipulation and order was entered dismissing plaintiff's state-created danger claim against Amtrak set forth in Count IV of the First Amended Complaint. (Docket No. 32). On March 13, 2017, a stipulation and order was entered dismissing Amtrak's cross-claims against SEPTA with prejudice, completely removing SEPTA as a party in this action. (Docket No. 38).

Plaintiff's common law negligence claim against Amtrak set forth in Count II of the First Amended Complaint is the only remaining claim pending in this action. In support of his claim, plaintiff has produced a "safety report" from Carl Berkowitz.

## STATEMENT OF FACTS

### A. The Incident at Issue

On July 3, 2014, between 8:45 p.m. and 9:15 p.m., plaintiff arrived at Wilmington Station intending to ride SEPTA's regional rail to Philadelphia. (See plaintiff's deposition transcript at Exhibit A, pp. 66, 69-70). Weather that night had caused service disruptions and delays on this line. (See Rodney Elliot deposition transcript at Exhibit B, pp. 45, 76-77). Around 10:00 p.m. to 10:30 p.m., plaintiff and other passengers at the Wilmington Station boarded an Amtrak train that was accepting SEPTA passengers. (Exh. A, p. 79; Exh. B, pp. 70-71). This Amtrak train picked up passengers at the station because SEPTA's service had been suspended. (Exh. B, pp. 78-79).

Plaintiff was visually impaired but not completely blind on the date of the incident. (Exh. A, p. 78). He was able to see a person's face and stature, the train, the train car aisle and the inside of the train car. (Exh. A, p. 82). Plaintiff had a stick with him to detect ground defects. (Exh. A, pp. 83-84).

When plaintiff boarded the Amtrak train in Wilmington, he sat "as close to the door as possible," two seats away from the door. (Exh. A, p. 80). Plaintiff does not know how many people were on the train. (Exh. A, p. 87). When plaintiff boarded the train, he "explained to the [conductor he] was visually impaired and [he] needed help," to which the conductor responded "I gotchu." (Exh. A, pp. 90-91). This was the only conversation plaintiff had with the conductor or any other Amtrak employee on the train. (Exh. A, pp. 93-94).

After additional delay, the Amtrak train eventually arrived at 30th Street Station on July 4, 2014 at approximately 2:00 a.m. (Exh. B, pp. 63-64). All Amtrak trains load and unload passengers onto platforms adjacent to tracks beneath the concourse of 30th Street Station. (See Lauren Anderson deposition transcript at Exhibit C, p. 26). The platforms are accessed from the

3

concourse by stairs or escalators. (Exh. C, pp. 25-26). The train transporting plaintiff arrived on Track No. 4. (Exh. B, p. 59).

Upon arriving at 30th Street Station, plaintiff prepared to exit the train "right away." (Exh. A, p. 98). Plaintiff "got up as soon as it seemed like the door was getting ready to open." (Id.) Plaintiff was standing up as the train doors opened. (Exh. A, p. 101). Plaintiff waited only until the doors opened for the conductor to return and assist him. (Id.). He did not wait any longer for the conductor and exited the train.

Plaintiff was speaking to his sisters on his cell phone as he exited the train. (Exh. A, pp. 101-102). After he exited the train, plaintiff walked a "[c]ouple feet" to his left to a stairway. (Exh. A, p. 103). Plaintiff then stood at the stairwell, holding the stairwell door, waiting for his sisters. (Exh. A, p. 103).

He continued talking to his sisters and remained at that location for a "[c]ouple minutes." (Exh. A, pp. 104-105). At this point, "something hit" him, but he does not know what it was. (Exh. A, pp. 105-106). Something hit his shoulder while he was holding the door to the stairwell, and he was knocked over and fell on the tracks. (Exh. A, pp. 105, 106, 110). He fell onto Track No. 3 on the opposite side of the platform from the train he had exited. (Exh. A, p. 110; Exh. B, pp. 53-54).

Plaintiff was on his cell phone the entire time he was holding the stairwell door. (Exh. A, p. 107). Plaintiff was not using his walking stick at the time of the incident because he was using his phone. (Exh. A, pp. 109-110). The walking stick remained in his bag. (Exh. A, p. 108).

None of the witnesses deposed in this case actually saw plaintiff fall onto the tracks.

### B. Carl Berkowitz's Report

Carl Berkowitz has provided a "safety report" that asserts that Amtrak's "lack of crowding policies and programs are to blame for this accident." (See Carl Berkowitz Report at Exhibit D, p. 3). In describing plaintiff's fall, Berkowitz claims that plaintiff "[s]tepped onto the platform and [was] stopped by the crowd" and was "[p]ushed backwards toward the platform edge by the platform crowd." (Exh. D, p. 12, Table 6).

Berkowitz claims that the passengers exited the train "onto an extremely crowded train platform" and that "the crowd that had gathered forced [plaintiff] off of the platform and onto the train tracks." (Exh. D, p. 11). Berkowitz alleges there was insufficient "information and time for [plaintiff], who is blind, to know how to avoid the crowded … platform areas" and that Amtrak "failed to warn of the crowding present on the platform so that passengers would be able to recognize and appreciate the danger." (Exh. D, p. 20). He claims that Amtrak "departed from a good and an acceptable transportation engineering practices and standards (sic)." (Exh. D, p. 28).[1]

In reaching these general conclusions, Berkowitz provided a list of alleged failures by Amtrak. Specifically, he claims Amtrak failed to:

- warn passengers of the "extraordinary unsafe crowding condition";

- provide "adequate and consistent training" to prepare its employees to identify unsafe conditions on the platform;

- have "a state-of-the-art safety system that would immediately identify and remedy an unsafe and hazardous condition of the platform," and Amtrak "was not proactive in managing areas utilized by their passengers (daily or more frequently) in order to ensure that the there are no unsafe conditions";

- failing to assess the platform "to identify where the potential for falls and to establish a team of qualified persons to determine the best means of reducing

---

[1] Berkowitz's report alleges that SEPTA is also responsible for plaintiff's injuries for the same reasons as Amtrak. He does not distinguish between Amtrak's actions and SEPTA's actions. As noted above, SEPTA has been dismissed from the case.

5

4823-0846-1383v.1

exposure from hazardous conditions" (in addition to "an out-of-date safety audit system, an incomplete inspection process and numerous management deficiencies");

- provide "effective cautionary communications on the train and at the platform in order to meet the passenger's safety needs and requirements";

- provide "personnel to help passengers disembarking from the train onto a crowded platform" (as well as separately listed but redundant conclusions that Amtrak failed to "provide crowd control at the ... platform" and failed to "provide for platform personnel to control platform crowding");

- "enforce rule compliance, which means discipline, and discipline means lots of time and paperwork";

- "update design standards to meet current Americans with Disabilities Act guidelines and practices established by the American Public Transit Association";

- "protect passengers from the human error on the part of the Railroad's employees," stating that "had they performed their duties and responsibilities properly this accident never could have occurred";

- "operate the platform in accordance with industry standards";

- "ensure that procedures are documented and actively controlled to guarantee that everyone involved remains current and relevant to safety requirements"; and

- "exercise diligences to protect" the passengers.

(See Exh. D, pp. 21-23).

Berkowitz reviewed various documents (as identified in his report) but never conducted a site inspection, took photographs or made any measurements of the platform at issue. He never conducted any type of testing, collection of data, observations, calculations, reenactment or other analysis. (See, generally, Exh. D, which contains no reference to site inspection, measurements, photographs, testing, data collection, observations, calculations or reenactments).

As discussed below, with respect to the conclusions set forth in Berkowitz's report, his opinions are based on incorrect information and data, and he fails to apply any specific principles or methodology in reaching his conclusions. Every single "conclusion" set forth in pages 20-24

6

of the General Findings and Opinions section of Berkowitz's report is subject to one or both of these fatal flaws. For these reasons, he should be precluded from testifying at the trial of this matter.

## LEGAL ARGUMENT

### A.   Standard for Admissibility of Expert Opinions

It is well settled that the proponent of expert evidence must establish the admissibility of that evidence under Federal Rule of Evidence 104(a). Bourjaily v. U.S., 483 U.S. 171, 175-76 (1987). In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the Supreme Court defined the District Court's gatekeeping role as requiring a determination as to whether an expert's testimony satisfies the general requirements of the Rules of Evidence. The District Court is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Based upon Daubert, F.R.E. 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

4823-0846-1383v.1

The proponent of the expert's testimony bears the burden of proving by a preponderance of the evidence that the Daubert standard is met and the expert's opinions are admissible. In re Paoli R.R. Yard PCB Litigation ("Paoli II"), 35 F.3d 717, 743-44 (3d Cir. 1994); see also Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999).

The Third Circuit has defined the requirements of Federal Rule of Evidence 702 under Daubert as a "trilogy" requirement: qualification, reliability, and fit. Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003). "First, the witness must be qualified to testify as an expert." Id. Second, the proponent of the testimony must prove by a preponderance of the evidence that it is reliable. Id. "In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." Id. (internal citations and quotations omitted). "An assessment of 'the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.'" Id. (quoting Dalbert). Finally, "the expert testimony must 'fit,' meaning the 'expert's testimony must be relevant for the purposes of the case and assist the trier of fact.'" Id. (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)) (internal citation omitted).

## B. Berkowitz's Conclusions Are Based Upon Incorrect Information and Should be Precluded

For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citations and internal quotation marks omitted).

The trial judge must determine whether the proposed testimony has a reliable foundation and is relevant. Daubert, 509 U.S. at 597. The focus is on the facts and data relied upon, as well

8

as the principles and methodology used, not solely whether the conclusions sound plausible. Id. at 595. To "establish a standard of evidentiary reliability," each step in the expert's reasoning must be supported by "good grounds." Id. at 590. "Any step that renders the analysis unreliable ... renders the expert's testimony inadmissible." Paoli II, 35 F.3d at 745 (emphasis in original).

In this case, the entirety of Berkowitz's report is premised upon a completely incorrect understanding of the events leading up to plaintiff falling onto the tracks. Contrary to the version of events set forth in Berkowitz's report, plaintiff never stated he was stopped by a crowd, pushed back by the crowd or caused to fall off the platform due to crowding. He very clearly testified that he exited the train as soon as the doors opened, walked several feet to the stairwell, and was holding the stairwell door for a "couple minutes," at which point "something" hit him and knocked him off the platform. Plaintiff never says anything about a crowd blocking his path or pushing him off the platform, and there is absolutely no evidence in the record that a crowd of passengers on the platform pushed plaintiff onto the tracks. According to plaintiff's version of events, the incident could have occurred even if only one other person was on the platform. Thus, any conclusions or opinions relating to a crowd on the platform or lack of crowd control by Amtrak rely upon insufficient facts and data, and simply do not "fit" the actual facts in this case.

This is a fundamental flaw in Berkowitz's report that warrants the preclusion of his testimony at trial. His entire report is premised on the conclusion that a crowd of people on the platform caused plaintiff to fall off the platform. There is absolutely no testimony from plaintiff or anyone else to support Berkowitz's description of the incident. He simply has the facts wrong and, as a consequence, the entirety of his report and its various conclusions are unreliable and should be precluded under Daubert.

In addition, Berkowitz gets other essential facts wrong. For example, he states that plaintiff is "completely blind" (Exh. D, p. 11), and makes multiple references to the importance of plaintiff's visual impairment in his report. (Exh. D, pp. 4, 5, 7, 9, 11, 20). In fact, plaintiff testified that he can see, and his vision on July 3, 2014 was sufficient enough to make out people's faces and stature, as well as the train and the aisle. Berkowitz also claims that when exiting the train, plaintiff "would normally use his cane to determine where he was going and even with this precaution he ended up on the track area." (Report, p. 23). This "fact" is inconsistent with plaintiff's own version of events: he testified that he would usually use his cane under similar circumstances, but in this instance he was NOT using his cane because he was using his cell phone as he exited the train.

As another example where Berkowitz gets the facts wrong in this case, page 12 of his report refers to photographs which allegedly show the incident location, as indicated by red arrows. (Exh. D, p. 12). However, this information is incorrect, and is not based on the facts in this case. Plaintiff specifically testified that he was holding the door to the stairwell when he was hit by something and knocked over. He never testified that he was in the location of the red arrows on the photographs, which are at least several feet away from the door, in between a wall and the platform edge.

Berkowitz also claims that plaintiff's "fall occurred in just a few seconds" (Exh. D, p. 5), but plaintiff unequivocally testified that he stood at the platform exit a couple minutes before he was bumped onto the tracks.

Berkowitz's conclusion that Amtrak failed to update design standards to meet current Americans with Disabilities Act ("ADA") guidelines likewise does not "fit" this case. Plaintiff's

10

4823-0846-1383v.1

First Amended Complaint does not contain any claims that Amtrak breached the ADA or any associated guidelines. (See Docket No. 12). Thus, this conclusion is completely irrelevant.

Other conclusions are similarly irrelevant and do not "fit" this case, including Berkowitz's assertions that Amtrak had an out-of-date safety audit system rather than a state-of-art safety system, and that Amtrak failed to enforce rule compliance and ensure that employees remain current as to safety requirements. These conclusions have no bearing on the issues in this case, as there are no facts within the record indicating that Amtrak's "safety system," training or compliance had any impact on plaintiff's alleged accident.

In short, Berkowitz is working with his own incorrect facts and version of events which have no basis in the record. None of the alleged failures by Amtrak have anything to do with the incident at issue: plaintiff did not fall due to a crowd, but instead was bumped by something or someone. While on the train, he was seated near a door, was one of the first passengers off the train, and he successfully navigated the few feet between the train and the stairwell, where he stood for a couple minutes, until he was bumped onto the tracks. Berkowitz's conclusions are not relevant to the issues in this case and should therefore be precluded.

### C. Berkowitz Has Not Applied Reliable Principles or Methods in Reaching His Conclusions, Which Should Therefore be Preclude as Not Reliable

Under Daubert, the expert testimony must be reliable, so that it must be "scientific," meaning grounded in the methods and procedures of science, and must constitute "knowledge," meaning something more than subjective belief or unsupported speculation. Daubert, 509 U.S. at 590. Guideposts that a court may consider in assessing the reliability of the proffered expert testimony include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; (4) the existence and

maintenance of standards controlling the technique's operation; (5) whether the technique has been generally accepted in the proper scientific community; (6) the relationship of the technique to methods which have been established as reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been applied. Paoli II, 35 F.3d at 742; see also Daubert, 509 U.S. at 593-94; In re TMI Litig., 193 F.3d 613, 663-64 (3d Cir. 1999); Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999).

Importantly, "the focus of a Daubert inquiry must be solely on the principles and methodology, not on the conclusions that they generate." Dearson v. Bostrom Seating, Inc., 241 F. Supp. 2d 494, 496 (E.D. Pa. 2003). The opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation." Paoli II, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590). A court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Heller, 167 F.3d at 153. "A court may conclude that there is simply too great a gap between the data and the opinion offered." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).

"If Daubert and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert." Pappas v. Sony Elecs., Inc., 136 F.Supp.2d 413, 426 (W.D. Pa. 2000). In Oddi v. Ford Motor Co., for example, the Third Circuit considered an engineer's opinion that a bread truck was defectively designed. 234 F.3d 136, 146, 156 (3d Cir. 2000). The engineer had engaged in a "haphazard, intuitive inquiry" using "little, if any, methodology beyond his own intuition." Id. at 156, 158. He made no calculations, did not test his hypotheses, and failed to consider alternative explanations for the extensive damage the truck sustained in a collision. Id. at 156–58. The Oddi court cited Paoli II for the principle

that, to satisfy the reliability requirement, "[a]n 'expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'" Id. at 158 (quoting Paoli II, 35 F.3d at 742). The court precluded the engineer's testimony, holding that his "*ipse dixit* [did] not withstand Daubert's scrutiny." Id.; see also Maldonado v. Walmart Store No. 2141, 2011 WL 1790840, *10-11 (E.D.Pa. 2011) (barring the testimony of an expert as *ipse dixit* where the expert did not conduct any independent investigation or site inspection, conducted no testing, and did not identify any methodology used in rendering her conclusions).

In the present case, Berkowitz never conducted a site inspection, took photographs or made any measurements of the platform at issue. He never conducted any type of testing, observation, collection of data, calculations, reenactment or other analysis. He does not cite any technique, methodology or principles to establish the validity of his conclusions. Instead, he makes broad, vague assertions, such as Amtrak failed to "operate the platform in accordance with industry standards," or blames "an out-of-date safety audit system, an incomplete inspection process and numerous management deficiencies," without actually providing any explanation as to what Amtrak did wrong. He complains that Amtrak failed to comply with guidelines and practices established by the American Public Transit Association, but does not cite any specific guidelines or practices that Amtrak should have followed.

At one point Berkowitz provides a chart setting forth various categories of platform crowding, cites an affidavit from a New York City Transit employee arising from unrelated litigation in New York as establishing the "design standard" for a train platform, and claims that the platform crowding at issue in this case was "in the range of D to E," meaning there were two to seven square feet per passenger, and passenger movement without touching was either virtually impossible or unavoidable, and circulation on the platform was severely restricted or not possible.

(Exh. D, pp. 10-11). Setting aside the fact that, as discussed above, overcrowding on the platform did not cause plaintiff's incident, this claim is completely without any basis. No such details regarding crowding were ever disclosed during discovery, and Berkowitz cites no factual basis for this conclusion. He never attempts to even quantify the number of people on the platform at the time of the incident at issue. Berkowitz clearly is speculating, which is not permissible under Daubert. See Curry v. Royal Oak Enterprises, LLC, 2013 WL 3196390, *6 (E.D.Pa. 2013) (characterizing plaintiff's expert's conclusions as "unsupported speculation" and precluding the expert's opinions as not reliable under Daubert because the expert did not attempt to recreate the accident, conducted no tests and "used little, if any, methodology beyond his own intuition") (quoting Oddi, 234 F.3d at 158).

On page 8 of his report, Berkowitz provides a chart setting forth "Organizations with Standards for Platform Safety," and while he attempts to identify certain "requirements" from these organizations, he fails to identify any specific codes, standards, provisions or regulations that applied to the platform. In fact, each of the "requirements" is completely and utterly vague, including general references to "[g]uidelines for safe pedestrian facilities" and "guidelines for railroad stations, platforms and the training of personnel," without identifying any specific guideline with which Amtrak failed to comply. Berkowitz fails to provide any specific examples of violations of any such provisions by Amtrak.

In addition to the examples of unsupported speculation cited above where no methodology was employed in reaching his conclusions, Berkowitz also sets forth large scale, unsupported condemnations of Amtrak and SEPTA (even though plaintiff's claims against SEPTA were dismissed with prejudice) that are inflammatory and have no factual basis in this case. For example, he claims:

14

> "The two Railroads for many years incorrectly assumed that it didn't matter how dangerous something is at their 30th Street Station...."
>
> ***
>
> "For years, Amtrak and SEPTA has (sic) turned a blind eye to these dangers and there has been a willful disregard for passenger safety do (sic) to their intentional actions."

(Exh. D, pp. 3, 20). Berkowitz does not cite a single incident or example of prior "dangers" or willful disregard for safety at 30th Street Station.

Berkowitz has simply failed to provide any explanation or specific examples to support the alleged failures by Amtrak, no methodology is identified, and his conclusions are unsubstantiated, conclusory assertions that have no actual foundation in the facts. The entirety of his report fails to comply with the standards set forth by Daubert and its progeny and therefore is not reliable. See Furlan v. Schindler Elevator Corp., 864 F.Supp.2d 291, 298 (E.D.Pa. 2012) (granting defendant's Daubert motion because plaintiff's expert used little, if any, methodology and conducted no tests); Moore v. State Farm Fire and Casualty Co., 2015 WL 5729266, * 3-4 (E.D.Pa. 2015) (barring the testimony of an expert as not reliable under Daubert because the expert did not explain any methodology used in reaching his conclusions and did not perform any testing); Jordan v. Yum Brands, Inc., 2013 WL 3819377, *4-5 (E.D.Pa. 2013) (holding that plaintiff's expert did not satisfy the Daubert reliability requirement because his report did not explain how he reached his opinions and he provided no methodology).

## **CONCLUSION**

For the foregoing reasons, Amtrak respectfully requests that the Court preclude Carl Berkowitz from testifying at the trial of this action.

BY: _____
Yuri J. Brunetti, Esq.
Daniel J. Gillin, Esq.
Landman Corsi Ballaine & Ford P.C.
1617 JFK Boulevard, Suite 955
Philadelphia, PA 19103
Telephone (215) 561-8540
Facsimile (215) 988-1215

Attorneys for Defendant National Railroad Passenger Corporation ("Amtrak")

Dated: April 25, 2017